IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **VENDR, INC.,**<br><br>     Plaintiff,<br><br>vs.<br><br>**TROPIC TECHNOLOGIES, INC., and GRAHAM SANDERS,**<br><br>     Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:23-CV-165-DAK-DAO<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Daphne A. Oberg |

This matter is before the court on Plaintiff Vendr, Inc.'s Motion for Temporary Restraining Order [ECF No. 16].   On April 27, 2023, the court held a hearing on the motion via zoom videoconferencing.   At the hearing, Monica S. Call and Eileen R. Ridley represented Vendr, L. Reid Skibell and Elizabeth M. Butler represented Defendant Tropic Technologies, Inc., and Robert O. Rice represented Defendant Graham Sanders.   The court took the motion under advisement.   After carefully considering the parties' memoranda and arguments as well as the facts and law relevant to the pending motion, the court issues the following Memorandum Decision and Order on the pending motion.

## BACKGROUND[1]

Plaintiff Vendr is suing Tropic Technologies and Graham Sanders in connection with

---

1   The court notes that the findings of fact and conclusions of law made by a court in deciding a preliminary injunction motion are not binding at the trial on the merits.   *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 649 (10th Cir. 1992), *overruled on other grounds, Systemcare, Inc. v. Wang Labs Corp.,* 117 F.3d 1137 (10th Cir. 1997) (recognizing that "the district court is not bound by its prior factual findings determined in a preliminary injunction hearing.").

Sanders's employment with Tropic and the alleged breach of his noncompete and nondisclosure

agreement with Vendr.   Vendr and Tropic compete as providers of multiple software as service

("SaaS") products and services.   These products and services include: 1) a

negotiation-as-a-service that helps customers negotiate contracts with third-party suppliers; 2) the

management of software contracts for customers from contract inception to contract execution; 3)

solutions to monitor customer's SaaS application usage; and 4) solutions to assist finance,

procurement, and information technology departments in the procuring of such SaaS solutions.

Vendr was founded in 2018 and has its principal place of business in Massachusetts.

Tropic was founded in 2019 and has its principal place of business in New York.   Vendr alleges

that it is the pioneer in the SaaS product and service provider field and that it is more prominent

than Tropic in the market.

Vendr considers the identity of its customers, technologies, processes, customer and

supplier data, and growth and product strategy to be confidential and proprietary.   Vendr limits

distribution and access to these materials within Vendr.   Vendr also takes measures to protect the

secrecy of the information it considers confidential and proprietary, such as maintaining

sophisticated IT security and infrastructure, using unique user IDs and strong passwords, and

requiring all employees to sign confidentiality and noncompete agreements.

Graham Sanders began working at Vendr on June 27, 2022, as a Senior Executive Buyer.

Sanders graduated from college in 2014 with a degree in Political Science and Government but

later found himself working for a variety of companies in the technology industry.   In 2021,

Sanders moved to Salt Lake City, Utah, to work for Lucid Technologies, where he worked until he

began working at Vendr in June of 2022.   As a Senior Executive Buyer, Sanders contacted

software service suppliers to negotiate contract terms for the service for Vendr's customers.   For

example, if a Vendr customer was party to a soon-to-expire contract for video-conference services, Sanders contacted the supplier to negotiate terms for a renewed service contract.

While Sanders worked at Vendr, there were forty buyers—five pods of buyers with eight in each pod.   Each pod handled 60-100 customers.   As a Senior Executive Buyer, Sanders did not have a dedicated group of customers with whom he worked, or an exclusive relationship with any particular customer.   Sanders negotiated contract terms with software suppliers on behalf of customers but was not primarily responsible for managing Vendr's relationships with its customers.   Vendr's Sales Team, Implementation Team, and Customer Satisfaction Team worked directly with customers.

When Sanders began his employment at Vendr, he entered into a written Employment Agreement and an accompanying Confidential Information and Inventions Assignment Agreement ("PIIA").   Pursuant to his written Employment Agreement, Sanders agreed to abide by Vendr's rules and policies, including the provisions of the PIIA confidentiality agreement. The PIIA stated that Sanders's employment created a "relationship of confidence and trust' with respect to the confidential information Sanders would have access to and that Vendr had a "protectable interest" in the Confidential Information, which was laid out in detail.   The PIIA also included a one-year noncompete provision precluding Sanders from employment with a competitor in the defined territory.   Sanders also agreed to return all company property when his employment with Vendr terminated.

As Senior Executive Buyer, Vendr alleges that Sanders was privy to confidential and proprietary information, including data insights, customer lists and contacts, supplier lists and contacts, overall business processes and strategies, product plans, and plans for growth.   Vendr alleges that Sanders participated in at least 100 individual customer deals across multiple

third-party suppliers and industries.   Sanders, however, states that he could not directly access

customer information on Vendr's platform but could be provided such information by other Vendr

teams.   Vendr used a platform called Salesforce to manage customer information.   Sanders did

not have access to Salesforce and could not access the customer information Vendr maintained in

Salesforce.   When Vendr assigned Sanders a customer contract, he would often receive a copy of

the service contract with a supplier so that he could negotiate a renewal contract.   But the details

of the contract were not secret to Vendr because the customer and the supplier had the terms of the

contract as well.

Sanders claims that he worked on too many contract renewals to be able to remember

customers' names, especially since his negotiations were with the suppliers.   Once he had new

terms for the customer's contract with a given supplier, he would post them in Vendr's system.   If

a customer had issues with the terms, they would work with the Customer Satisfaction Team.   He

had little contact with customers and limited, short-term contact with service providers.

After working for Vendr for seven months, Sanders was unsatisfied with his job, largely

because he felt that the workload was excessive.   He requested help regulating his workload, but

his manager continued assigning him assignments that he felt were overwhelming.   In late 2022,

Sanders began looking for employment with other technology companies.   Around that time,

Sanders responded to an inquiry from Tropic.   Sanders states that he told Tropic about the PIIA,

and Tropic claims that it instructed him not to bring any information or materials from Vendr over

with him.

On January 4, 2023, Sanders gave Vendr two weeks' notice of his intent to leave his

employment with Vendr.   Sanders' employment with Vendr terminated January 18, 2023.

During his exit interview over a video call with Mike Dockendorf, Vendr's Human Resources

4

Business Partner, Vendr claims that Sanders did not disclose that he was going to work for a competitor, despite being asked, and that he was reminded of his continued contractual legal obligations.   Sanders, however, claims that Dockendorf did not discuss or reference any contractual obligations.

Vendr also alleges that Sanders downloaded a significant amount of confidential, proprietary, or trade secret information from Vendr's server to his company computer in the last weeks of his employment.   Vendr's IT systems show that, in the last two weeks of Sanders' employment, there was a spike in Sanders' computer downloads.   Vendr alleges that it appears that Sanders downloaded a list of all the deals he had worked on, as well as information about other deals with which he was not involved.   The list of deals showed the buyer, supplier, stakeholders, type of deal, dates, and pricing.   Vendr alleges that he copied that information to a personal computer or device and then allegedly wiped all data from his computer before returning it to Vendr contrary to the PIIA's requirement not to delete any information contained on his company computer.

Sanders, however, denies taking any confidential or proprietary information from Vendr. He claims that the only documents he transferred from his Vendr laptop to a personal device was his company photograph and a spreadsheet containing personal information.   The latter was basically an electronic version of a spiral notebook where he saved dates, events, and other information.   None of the information in the spreadsheet was confidential or proprietary to Vendr. Sanders also explains the spike in his downloads to a request from his supervisor to compile a list of all his deals to give to colleagues to assist in the transition of work when he left.

Furthermore, Sanders takes issue with Vendr's claim that he improperly deleted information on his company laptop prior to returning it.   This claim, Sanders contends, does not

take into consideration the types of instructions Vendr gives its employees in practice about returning their laptops.   On January 9, 2023, Sanders received an email from Dockendorf entitled "Final Day Info" providing him with information about wrapping up his time with Vendr. Dockendorf advised Sanders that his "systems access will automatically shut off at 6PM local time on [his] final day of work.   Please make sure to remove any personal information before then." He also instructed Sanders to return his laptop via federal express.   To remove any personal data that might exist on the laptop, Sanders performed a factory reset on the laptop.   Sanders believed that resetting the laptop to its factory settings was the most efficient way to get all his personal information off the laptop.   Sanders states that he had done this previously with other employers when returning a laptop as well as cellphones.   Returning a laptop in this manner should not have caused Vendr to lose any company data.   Because Sanders' laptop was linked to Vendr's systems, any information belonging to Vendr would have already been backed up to the company's servers. The only information the reset would have removed from Vendr's system would have been Sanders's personal information, which Vendr specifically told him to remove.

On January 25, 2023, Sanders joined Tropic as a Senior Commercial Executive. Vendr claims that Tropic employs Sanders in a comparable position to the one that he held at Vendr, and his duties and responsibilities would substantially overlap with his duties and responsibilities at Vendr.   Vendr, therefore, notified Sanders and Tropic that it believed his employment at Tropic breached the PIIA.

Sanders states that following receipt of the letter, he informed Tropic about the photo and spreadsheet he had transferred from his Vendr laptop.   Tropic advised him to delete the spreadsheet, which he did by permanently deleting the file.   The only property in Sanders' possession that might be considered Vendr property is a computer monitor that he was told he did

6

not need to return and a hat and water bottle with Vendr's branding on it.

Vendr claims that its information could assist Sanders in his employment at Tropic. However, Vendr does not know of any overlapping customers between the two companies. Vendr only claims that the companies compete in the market for the same customers.   Sanders states that he did not need any information from Vendr to do his job at Tropic. Sanders provided a declaration stating that he has not used any information that is confidential or proprietary to Vendr during his employment with Tropic.   Sanders further states that he does not have access to any Vendr information that the company internally stored in its systems, including information about customers, contract pricing, suppliers, or information that he understands might constitute inventions, ideas, processes, formulas, software in source or object code, data, technology, know-how, designs, and techniques that relate to Vendr.   He also claims it would be impossible for him to remember details of information that he might have had access to while working at Vendr because of the sheer volume of material stored on Vendr's systems.   The supplier contracts Sanders negotiated at Vendr are, for the most part, unique to each customer, and contract pricing that he might have negotiated was so varied and nuanced that he cannot remember details of those arrangements.   Sanders states that he has no need for any Vendr information since Tropic's systems contain any data he needs to perform his job.   The information Sanders uses in his work for Tropic comes only from Tropic or other third parties.

In response to Vendr's cease-and-desist letter, Tropic claims that it voluntarily agreed for Sanders not to use any information he had from Vendr, if he had any, and to wall him off from any suppliers he worked with at Vendr.   Tropic also told Vendr that they thought terminating Sanders was unwarranted because he was not in a management position, and he had already begun his employment.   Tropic offered to discuss any additional prophylactic measures that Vendr believed

might be necessary.   Tropic also told Vendr that if it believed that Sanders was in possession of any confidential or proprietary information, to notify Tropic immediately.

The parties went through another round of letters back and forth regarding Sanders' situation but could not agree on measures to alleviate Vendr's concerns.   Vendr did not respond to Tropic's final letter on February 22, 2023.

On March 7, 2023, both parties filed lawsuits against the other.   Tropic filed a lawsuit against Vendr in New York state court to address Vendr's continuing accusations, *Tropic Technologies, Inc. v. Vendr, Inc.*, Index No. 651216/2023.   The New York action seeks a declaration that Tropic did not tortiously interfere with Sanders' employment agreement with Vendr, the restrictive covenants in Sanders's Employment Agreement and the PIIA are void pursuant to the Massachusetts Noncompetition Agreement Act, and that Tropic's exploratory conversations with individuals employed by Vendr do not constitute tortious interference with their employment agreements.   Tropic's counsel emailed Vendr's counsel informing them of the New York action.

Vendr, however, contends that it filed this action minutes before Tropic's New York action.   Approximately two weeks later, Vendr filed the present motion for temporary injunctive relief.   Vendr's motion seeks to have Sanders' employment with Tropic terminated.   Sanders states that his termination would have a tremendous negative impact on his life because of the bleak job market in the tech industry.   He also has a year-long lease at his new rental unit in Denver that he entered into on February 23, 2023, after he started working for Tropic.   Vendr's attacks on his reputation will also make it difficult for Sanders to find employment in the tech industry because it is claiming that he misappropriated confidential information.   Anyone who searches Sanders' name online, will see the declaration claiming misappropriation.

Vendr claims that Tropic has developed a concerted campaign to recruit Vendr's employees despite Tropic's knowledge that all of Vendr's employees are subject to Employment Agreements that include confidentiality and noncompete obligations.   Vendr claims that Sanders is just one such employee.   Even after Vendr put Tropic on notice with cease-and-desist letters, it alleges that Tropic continued concerted efforts to contact and recruit Vendr employees.

Tropic, on the other hand, claims that this lawsuit is "pay back" for a lawsuit it brought against Vendr last year when one of Tropic's senior level, company-founding employees left Tropic to work for Vendr and took hundreds of specific proprietary documents.   Tropic successfully obtained injunctive relief against Vendr in relation to that employee for interference with contract.

## DISCUSSION

### Plaintiff's Motion for Temporary Restraining Order

Vendr seeks preliminary injunctive relief based on its breach of contract claim against Sanders.   A preliminary injunction is an "extraordinary and drastic remedy." *Warner v. Gross*, 776 F.3d 721, 728 (10th Cir. 2015).   Preliminary injunctive relief is appropriate if the moving party establishes: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *Roda Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).   Because a preliminary injunction is an extraordinary remedy, the "right to relief must be clear and unequivocal." *SCFC LLC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991).

Vendr refers to the more lenient "fair ground for litigation" preliminary injunction standard for the likelihood of success on the merits element, but the Tenth Circuit abandoned that standard

in *Dine Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016) (prior modified test is inconsistent with the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008)). "Under *Winter's* rationale, any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." *Id.* Therefore, Vendr must meet the traditional standard and demonstrate that it is clearly and unequivocally likely to succeed on the merits of its breach of contract claim.

The parties also dispute whether Vendr is seeking a disfavored preliminary injunction. In the Tenth Circuit, certain types of injunctions are disfavored: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Schrier v. University of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005) (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004)). "Such disfavored injunctions 'must be more closely scrutinized to assure that the exigencies of that case support the granting of a remedy that is extraordinary even in the normal course.'" *Id*.

Vendr argues that the injunction preserves the status quo. The status quo for purposes of a preliminary injunction is "the 'last peaceable uncontested status existing between the parties before the dispute developed.'" *Schrier*, 427 F.3d at 1260. In this case, the last peaceable uncontested status between the parties was before Sanders began his employment with Tropic. Therefore, Vendr's requested temporary restraining order does not seek to alter the status quo.

However, Defendants argue that Vendr's proposed temporary restraining order is a disfavored injunction because it is mandatory rather than prohibitory. Tropic claims that Vendr's requested TRO/preliminary injunction would require the court to oversee Tropic's business to ensure the company is not misusing unidentified confidential information and to terminate a junior

employee.   "'Although mandatory injunctions also *generally* alter the status quo, that is not always the case.'"   *Schrier*, 427 F.3d at 1260 (citations omitted).   An injunction is mandatory if it will   "affirmatively require the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction."   *Id.* at 1261.   The Tenth Circuit has recognized that "[t]here is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing."   *O Centro*, 389 F.3d at 1006.   "'In many instances, this distinction is more semantical than substantive.   For to order a party to refrain from performing a given act is to limit his ability to perform any alternative act; similarly, an order to perform in a particular manner may be tantamount to a proscription against performing in any other.'"   *Id.* (citation omitted).

Although Vendr maintains that the injunction would not be mandatory because the request only requires Sanders to abide by the terms of the noncompete and nondisclosure agreements during the pendency of the case, Vendr's injunction requires Sanders to resign from his employment with Tropic.   In *Schrier*, the court found that the preliminary injunction requiring a change in employment status—the reinstatement of a university faculty member to the department chair position—was a mandatory injunction.   *Id.* at 1246.   However, the *Schrier* court also found that reinstatement would place the court in a position where it may have to provide supervision. In this case, the court fails to see how it would have to supervise Defendants' actions if Sanders resigned from Tropic.   The courts frequently enjoin a party from using a competitor's confidential information without considering the injunction mandatory.   The court finds that the injunction would not be mandatory and concludes that the court need not subject the injunction to closer scrutiny.

Neither party claims that the temporary restraining order would give Vendr all the relief it seeks on its breach of contract claim.   Vendr seeks monetary damages in addition to injunctive relief in relation to Sanders' alleged breach of contract.   The court, therefore, concludes that Vendr's requested temporary restraining order is not a disfavored injunction under Tenth Circuit law.   But the court recognizes that the traditional preliminary injunction standard that requires Vendr to demonstrate that its right to relief is clear and unequivocal is "extraordinary even in the normal course."   *O Centro*, 389 F.3d at 975.

### 1. Likelihood of Success on the Merits

Vendr argues that it is likely to succeed on its breach of contract claim because it is clear that Sanders breached his contract with Vendr and Vendr has suffered damages as a direct and proximate result of Sanders's breaches.   Utah law applies to Vendr's breach of contract claim, and Vendr has alleged all the elements required under Utah law.   *See Klason Co. v. Stentor Elec. Mftg Co*, 313 U.S. 487 (1941); *Daz Mgmt. LLC v. Honnen Equip. Co.*, 508 P.3d 84, 91 (Utah 2022).   Vendr has alleged that there is an enforceable contract between itself and Sanders, Vendr has met its obligations under the agreement, Sanders's employment with Tropic has breached the agreement, and Vendr has suffered damages as a result of the breach.

Vendr alleges that Sanders breached the noncompete provision by accepting employment with a direct competitor within a year of his employment with Vendr.   Tropic, however, argues that the noncompete clause is unenforceable under Utah law.   Under Utah law, a covenant not to compete is only valid and enforceable if (1) the covenant is supported by consideration; (2) no bad faith is shown in the negotiation of the contract; (3) the covenant is necessary to protect the goodwill of the business; and (4) it is reasonable in its restrictions as to time and area.   *See System Concepts v. Dixon*, 669 P.2d 421, 425-26 (Utah 1983).   The Utah Supreme Court has long held

that any goodwill must be created by the employee himself, such that the employee's personal reputation could draw away customers.   *See Allen v. Rose Park Pharmacy*, 237 P.2d 823, 827 (1951).   Courts recognize that noncompete agreements are valid where they protect trade secrets, goodwill, or an extraordinary investment in the education or training of an employee.   *See Sys. Concepts*, 669 P.2d at 4426.   Even if the employee learns no trade secrets, courts have upheld noncompete agreements where the employee may "draw away customers from his former employer."   *Kasco Servs. Corp. v. Benson*, 831 P.2d 86, 88 (Utah 1992).

Vendr has not pointed to any current customer that Sanders is likely to draw away from Vendr, nor has it explained how any goodwill could be associated with Sanders.   He was a junior employee who worked for Vendr for only seven months and his position negotiating service contracts did not involve direct customer contact.   Vendr also does not explain how any information Sanders could remember regarding software suppliers would give Tropic a competitive advantage given that Tropic has agreed to wall him off from working with any software suppliers he worked with at Vendr.   In addition, Sanders states that there were too many negotiations and small details with each negotiation for him to remember specific details. Sanders states that Tropic provides him with all the data he needs for his work with Tropic's specific software suppliers.   Moreover, Vendr refers to training Sanders, but it does not provide evidence that his training was an extraordinary investment.   Sanders worked for Vendr for only seven months, and while he appears to have received the training needed to complete the tasks involved with his job, nothing Vendr presents demonstrates that the investment in his training was extraordinary.

Under Utah law, Vendr must also demonstrate that Sanders can be covered by a noncompete agreement because his services are special, unique, or extraordinary.   *Systems*

*Concepts*, 669 P.2d at 426.   Utah law does not permit an employer to restrict a conventional employee through a noncompete agreement.   *See Robbins v. Finlay*, 645 P.2d 623, 627-28 (Utah 1982) (holding that even though employee "was a sophisticated salesperson" there was "no showing that his services were special, unique, or extraordinary, even if their value to his employer was high").

Sanders held a junior position during his employment with Vendr.   As one of forty buyers, Sanders does not appear to have a unique position.   He had no direct access to competitive or strategic information—it was supplied to him from other employees on a case-by-case basis. Vendr, however, requires all its employees to sign noncompete agreements.   Vendr sent Tropic a letter stating that all of Vendr's employees are subject to noncompete provisions.   Such a practice appears to be against Utah law.

Utah law declines to enforce noncompete agreements except where they are "carefully drawn to protect only the legitimate interests of the employer."   *Robbins*, 645 P.2d at 627.   Given that Sanders is not in a special, unique, or extraordinary position, the confidentiality and non-solicit protections in the PIIA appear to be sufficient to protect Vendr's legitimate business interests with junior level employees such as Sanders.   The noncompete provision would, therefore, be superfluous.   Vendr has not provided the court with a legitimate business purpose for requiring every employee to sign a noncompete agreement.   At least at this preliminary stage, Vendr's PIIA for run-of-the-mill employees appears to be legally void as a restraint on the right to engage in a common calling and primarily designed to limit competition.   *Id.*

Based on the evidence before the court at this preliminary stage, Vendr has not clearly demonstrated that Sanders' noncompete agreement is necessary to protect Vendr's goodwill or that its restrictions are reasonable.   Therefore, the court cannot conclude that Vendr is likely to

succeed on its claim that Sanders breached the noncompete agreement by working for a competitor.

Vendr also argues that Sanders breached the PIIA's nondisclosure provisions.   As a buyer, Sanders assisted Vendr's customers in procuring new service contracts from suppliers.   Vendr claims it gave Sanders access to its "playbook" of data and strategies for each supplier to help him perform his job.   Because of this access, Vendr asserts that it is inevitable that Sanders will use and/or disclose Vendr's confidential information and trade secrets to Tropic, which will competitively harm Vendr.

To support its speculation that Sanders will use and/or disclose the information he used while employed at Vendr, Vendr alleges that Sanders downloaded information from Vendr's system.   However, Sanders submitted a declaration testifying that he did not take any of Vendr's information.   Sanders also explains in his declaration that he only downloaded information his supervisor specifically asked him to collate and provide to his colleagues.   At this point of the litigation, Vendr has not identified any confidential information Sanders actually took or that he has misappropriated.   Vendr's allegations appear to be merely speculative.   Whereas, Sanders and Tropic categorically deny that he took or disclosed any information to Tropic.   At best for Vendr, the evidence before the court presents a disputed fact as to whether Sanders took any information.   That dispute does not clearly demonstrate a likelihood of success on the merits of Vendr's claim for breach of the PIIA's nondisclosure provision.

Moreover, not only has Sanders submitted a declaration that he did not take any of Vendr's information, Tropic has voluntarily agreed not to use any information that Sanders might disclose to it.   To the extent that Sanders might be able to recall specific information regarding a software supplier, Tropic has already walled off Sanders from working with any suppliers he worked with at

Vendr.   Thus, even if Sanders could remember information or was somehow inclined to breach any confidentiality obligations to Vendr, as Vendr argues, he would be unable to make use of information he learned while employed by Tropic because they have walled him off from prior suppliers.   Based on the evidence presently before the court, the court cannot conclude that Vendr is likely to succeed on the merits of its claim against Sanders for breach of the PIIA's nondisclosure provisions.

Vendr further argues that Sanders breached the PIIA's technology provision by wiping the computer before returning it to Vendr.   However, Sanders has submitted evidence that he was given conflicting information from Vendr employees when he was preparing to leave.   In addition, Sanders claims that resetting his laptop to factory settings was the most efficient means of deleting any personal information off the computer and the reset would not lead to Vendr's loss of any of its own information because that information is contained on Vendr's network.   While there may be a technical breach of the provision, there are disputed facts as to what Vendr asked Sanders to do when turning in his laptop.   And not only are their factual disputes weighing against Vendr's claim for breach of the technology provision, Vendr has not demonstrated how the breach of the technology provision would support preliminary injunctive relief.   To the extent that this technology provision breach is tied to Vendr's claim that Sanders may have taken confidential information and may use that information to harm Vendr, Vendr has not demonstrated that either of those things have happened or are likely to happen.   Standing alone, however, a potential breach of the technology provision does not appear to be a sufficient basis to support injunctive relief.

Based on the evidence before the court at this preliminary stage, the court concludes that Vendr has not demonstrated a likelihood of success on the merits of its breach of contract claim

against Sanders.   Vendr has not clearly demonstrated that the noncompete provision is valid and enforceable under Utah law, that Sanders has breached or is likely to breach the nondisclosure provision, and that Sanders breached the technology provision or that such provision would support the drastic remedy of preliminary injunctive relief.   Although Vendr's failure to meet this element for preliminary injunctive relief is dispositive of the motion, the court will proceed to address irreparable harm as well because it is usually considered the most important element for preliminary injunctive relief.

### 2.   Irreparable Harm

Vendr argues that in the absence of immediate injunctive relief, it will suffer, and already has suffered, irreparable harm based on Sanders' alleged breach of his nondisclosure and noncompete agreements.   "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."   *New Mexico Dep't of Game & Fish v. United States Dep't of Interior*, 854 F.3d 1236, 1249 (10th Cir. 2017).   Under Tenth Circuit law, "[i]rreparable harm is not harm that is merely serious or substantial. . . . The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."   *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).   "The question is not just whether [plaintiff] faces a concrete and imminent injury, but whether such an injury will be irreparable without the injunction."   *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012).   "A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain."   *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001).

Vendr asserts that Sanders' and Tropic's continuing improper conduct will irreparably

harm Vendr unless Sanders is restrained from working at Tropic.   Vendr asserts that Sanders, through copied computer information and his own memory, is sharing Vendr's confidential information with a direct competitor, which will diminish Vendr's competitive position in the marketplace and result in a loss of reputation, goodwill, and business opportunities.   Vendr argues that money damages will not compensate it for such damage, Sanders recognized that in the PIIA, and only specific performance of Sanders's contractual obligations will prevent this alleged irreparable harm.

Vendr contends that the harm it faces cannot be compensated after the fact because it is the type of harm that is difficult to calculate in monetary damages and involves intangibles such as loss of a competitive market position and business opportunities.   *Trial Lawyers College v. Gerry Spence Trial Lawyers College*, 23 F.4th 1262, 1271 (10th Cir. 2022).

Nobody disagrees with the assertion that the use of a party's confidential, proprietary information can irreparably harm a party's reputation and position on the marketplace.   But Vendr's alleged irreparable harm in this case appears to be premised on mere speculation. Sanders submitted a declaration stating that he did not take any confidential information from Vendr, he has not given any to Tropic, and has no plans to do his job at Tropic with anything other than the information Tropic gives him.   Tropic also asserts that it has not obtained any of Vendr's confidential information.   Tropic also agrees not to allow Sanders to provide it with any information in the event that he has any to provide. Moreover, Tropic has walled off Sanders from working with any software suppliers he worked with at Vendr in case Sanders can recall any confidential information related to those suppliers.

Vendr's speculative harms are not irreparable and do not support injunctive relief.   "To constitute irreparable harm, an injury must be certain, great, actual, and not theoretical."

18

*Heideman*, 348 F.3d at 1189.   The Tenth Circuit has cautioned that "demonstrating irreparable harm is not an easy burden to fulfill."   *DTC Energy Grp. v. Hirschfield*, 912 F.3d 1263, 1270 (10th Cir. 2018).

There is no evidence in this case to support Vendr's claim that Sanders copied confidential information from his company computer to a personal computer and that, even if he had not taken such information, he would retain this information in his memory.   Significantly, Vendr makes this claims with no actual evidence. Vendr does not identify what, if any, information Sanders stole or that Tropic has and will supposedly misuse.   Vendr's contention that on information and belief such theft occurred, without more, does not establish a certain, great, and actual injury. "[A] court should be wary of issuing an injunction based solely upon allegations and conclusory affidavits."   *Am. Civil. Liberties Union*, 815 F. Supp. 2d 1204, 1220 (D. Kan. 2011); *Touchstone v. McDermott*, 120 F. Supp. 2d 1055, 1059 (M.D. Fla. 2000) (finding allegations made on "information and belief" even if in a verified pleading, are "insufficient to support a motion for preliminary injunction."), *aff'd*, 234 F.3d 1133 (11th Cir. 2000).

Vendr cites to no authority in this Circuit or otherwise in which an injunction was entered despite a moving party being unable to identify what information was stolen, misused, or will be misused.   While Vendr asserts that Sanders will inevitably disclose its confidential information, there is no basis for that contention.   Vendr cites no authority for the proposition that Utah follows the inevitable disclosure doctrine.   Sanders worked at Vendr for only 7 months in a junior position, where he was exposed to large amounts of highly specific, constantly changing data about the SaaS contract requirements for certain customers.   This is not a situation where Sanders was privy to strategic business plans or strategies that would invariably influence his work at Tropic.   Sanders has provided sworn testimony to the court that he does not remember the specific

needs or information regarding a customer's SaaS contract requirements.   Having now been at Tropic for four months and exposed to its data and information, Sanders states that he recalls nothing from Vendr.   Because it is doubtful that any information still stuck in his mind relating to Vendr would be of competitive value, "[t]his case does not factually rise to the level of being an inevitable discovery case."   *Utah Med. Prod., Inc. v. Clinical Innovations Assocs.*, 79 F. Supp. 2d 1290, 1314 (D. Utah 1999).   Moreover, Tropic has agreed to wall off Sanders from working with suppliers he worked at with Vendr in case Sanders could recall any information during his employment with Tropic.

Vendr also claims that Sanders' downloads "spiked" during his last two weeks of employment at Vendr.   It also claims that he made a list of every deal he worked on at Vendr. But Sanders testified that his supervisor at Vendr asked him to compile that list of deals to aid his colleagues in the transition and that compiling the list is what caused his downloads to spike. Vendr does not deny that Sanders' supervisor requested Sanders to compile the information. While Vendr claims that it does not think the supervisor's request would account for all of Sanders' downloads, it does not base that assertion on any actual evidence.   It is mere speculation at this point.   Maybe Vendr will be able to prove its assertions after discovery, but it is not entitled to obtain a preliminary injunction based on assertions it thinks it might be able to prove down the road.   Defendants have presented sworn declarations from individuals with first-hand knowledge of their own actions.   Vendr's allegations cannot counter that testimony.

In addition, Vendr has not specified how or why the unspecified confidential information is of competitive value such that it would be irreparably harmed.   Vendr's argument that the information "will diminish Vendr's competitive position in the marketplace" is speculative and does not demonstrate that irreparable injury is likely in the absence of an injunction. Likewise,

Vendr does not explain how Tropic will use this alleged information, only that it will occur.

The Tenth Circuit has specifically rejected the argument Vendr makes here that an "intangible injury" will support a permanent injunction. *KeyBank Nat'l Ass'n v. Williams*, 2022 WL 402379, at *4. *KeyBank* involved a former employer claiming it would suffer irreparable injury in "the form of diminished customer relationships, goodwill, and competitive standing" after two employees misappropriated information before moving to a competitor. *Id.* The Tenth Circuit upheld the district court's denial of a preliminary injunction because the former employer did not demonstrate that it had suffered an "actual injury" caused by the two employees. *Id.* If the former employer in *KeyBank* could not show irreparable harm where there was evidence of actual misappropriation, Vendr cannot demonstrate irreparable harm by merely speculating about misappropriation.

Vendr's only response to the *KeyBank* case is that it operates its business in a new, innovative industry with more confidential information to protect than a bank. There is no doubt that Vendr is a new and innovative business. But that does not mean that it has more confidential information to protect than a bank. Moreover, the principle to take from *KeyBank* is that a party must show some evidence of misappropriation. Vendr's arguments also fail because Tropic has voluntarily agreed to the very relief Vendr seeks: Tropic has agreed not to use any information that Sanders might disclose to it and has already walled him off from any suppliers he worked with at Vendr. And, even if Sanders was somehow inclined to violate any confidentiality obligations to Vendr, he would be unable to make use of information he learned while employed by Tropic because they have walled him off from prior suppliers. Those commitments are more than ample to protect Vendr's legitimate business interests. Moreover, Vendr has ignored Tropic's request to come up with any additional measures Vendr believes may be necessary. That failure to act

weighs against a finding that Vendr's harm is certain, great, actual, and not theoretical.

Sanders denies that he took any confidential information from Vendr, and his sworn testimony is sufficient to defeat Vendr's motion given the absence of evidence to the contrary. *See Novus Franchising, Inc. v. Brockbank*, 2016 WL 4734589, at *15 (D. Utah Sept. 9, 2016) (denying TRO based on moving party's "failure to provide sufficient evidence that defendants are using or disclosing its alleged trade secrets or confidential information").   For Vendr to show irreparable harm, it must have some evidence that Sanders took proprietary information from Vendr, but there is no support for that proposition other than speculation.   Sanders would then need to somehow breach the prophylactic "wall" that Tropic has placed around him, and Tropic would have to deliberately use whatever information Sanders provided it, knowing that such information was in violation of its voluntary prophylactic measures.   Vendr asks the court simply not to believe anything other parties put in sworn testimony to the court.   However, the court is not in a position to question the evidence Defendants have submitted when Vendr provides only speculation.   The court appreciates the fact that the parties are competitors but that does not provide a basis for discounting sworn testimony.   The fact that a junior level employee, who worked at the company for seven months, has gone to work for a competitor is not enough.   Vendr needs some evidence to suggest that Sanders took, and Tropic is using, Vendr's confidential information.   Without any such evidence, Vendr cannot at this stage of the litigation prove a clear and present harm to its competitive position.

Vendr also claims that its goodwill with customers will be damaged if Sanders is permitted to remain at Tropic.   However, Sanders did not have a customer-facing role.   Rather, other Tropic teams got the customers, and Sanders was merely asked to negotiate new software renewals with software suppliers for the customer.   He would then post the terms of the renewal for the

customer to see, and if the customer did not like the terms Sanders secured, the customer dealt with someone in customer service.   This is a very limited role.   He did not secure customers or work with them if there were problems.   There is no indication that any customer used Vendr or that Vendr retained any customer because of Sanders.   Vendr has provided no evidence that it has lost any customer because Sanders left.   Vendr claims that Sanders had a significant role with customers because his bonus was tied entirely to customer health and retention.   Sanders, however, counters that assertion by stating that he never received a bonus, but if he had, it would have been based on the savings he realized for customers and the number of vendor contracts he negotiated.   There is no evidence regarding Sanders' role with customers that would demonstrate Vendr is suffering or likely to suffer the loss of customer goodwill because Sanders went to work for Tropic.   Therefore, at this stage of the litigation, Vendr has failed to establish the type of clear and present irreparable harm necessary for preliminary injunctive relief.

### 3.  Balance of Harms

The court further finds that the balance of equities weighs against Vendr's request for temporary injunctive relief because the injury the proposed injunction would cause Sanders outweighs the speculative harm Vendr claims it could suffer.   Vendr argues that its request to enforce the Employment Agreement and the PIIA is merely asking for Sanders to perform his obligations under the contract.   However, the court has already expressed its concern that the noncompete agreement is unenforceable for a junior-level employee who has no customer relationships.   Utah law does not support Vendr's use of a noncompete agreement with every employee.   Moreover, there is no actual evidence that Sanders is not performing his obligations with respect to the nondisclosure provisions.   Given those circumstances, asking for Sanders to be terminated or put on leave is a drastic remedy.   If Sanders lost his job and health care benefits in a

23

job market where tech companies are laying off employees, not hiring them, his harm would be actual and concrete.   The effect of these claims on Sanders and his career and career prospects is also real and would be substantial.   Moreover, Tropic has taken appropriate measures to eliminate any risk, real or imagined, that Sanders may inadvertently disclose Vendr's confidential information.   Tropic has walled Sanders off from interacting in any capacity with vendors he worked with at Vendr.   Vendr provides no reason to doubt these protections other than to claim that its competitor cannot be trusted.   However, there is no evidence to suggest that Tropic cannot be trusted.

Vendr "has the burden of showing that 'the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003).   The alleged injuries Vendr describes in its motion are theoretical at this point.   Vendr does not claim to have lost a single customer.   And no customers appear to be at risk because Sanders did not have contact with customers in a way that developed any kind of relationship.   The only harm Vendr discusses with respect to its confidential or trade secrets is speculative harm that Sanders may inevitably disclose still-unidentified information to someone at a company that has walled him off from disclosing such information. Sanders has presented evidence that he has not used, and has no use for, any Vendr information.   All the information Sanders needs to perform his duties for Tropic is available internally from Tropic. There is no actual risk that Sanders will use or disclose any confidential information.   Vendr has not clearly demonstrated that there is an actual risk that Sanders will use or disclose any confidential information.   After weighing the balance of harms, based on the evidence presently before the court, the court concludes that Vendr has not met its burden of establishing that the balance of harms weighs in its favor.

Vendr argues that if the court does not enforce Sanders's noncompete agreement, Tropic will "surely" be emboldened in its effort to recruit Vendr employees that it knows are bound by confidentiality and noncompete agreements. But Vendr is not moving for preliminary injunctive relief based on its claims against Vendr. It is only moving on its breach of contract claim against Sanders. Moreover, because this is a motion for preliminary injunctive relief, the court has not made a definitive ruling on the enforceability of Vendr's noncompete agreements. The court has merely determined, based on the evidence before it at this time, that there is not a likelihood of success on the merits of Vendr's breach of contract claim or concrete irreparable harm. The case is ongoing, however, and the court and parties should recognize that discovery can significantly change matters. Given that Vendr could move for injunctive relief at any time it had actual evidence that Sanders had breached his nondisclosure agreement, there is no reason for the court to assume that the parties have an incentive to start breaching the agreement as a result of this decision.

Because the court has concluded that Vendr has not demonstrated a likelihood of success on the merits, irreparable harm, or that the balance of harms weighs in its favor, the court denies Vendr's Motion for Temporary Restraining Order.

## CONCLUSION

Based on the above reasoning, Plaintiff Vendr, Inc.'s Motion for Temporary Restraining Order [ECF No. 16] is DENIED.

DATED this 6th day of June, 2023.

BY THE COURT:

DALE A. KIMBALL,
UNITED STATES DISTRICT JUDGE