## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **VENDR, INC.,**<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>**TROPIC TECHNOLOGIES, INC., and GRAHAM SANDERS,**<br><br>　　　　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:23-CV-165-DAK-DAO<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Daphne A. Oberg |

This matter is before the court on Defendant Tropic Technologies, Inc.' Motion to Dismiss [ECF No. 60], and Defendant Graham Sanders' Motion to Stay and Compel Arbitration [ECF No. 62]. On October 3, 2023, the court held a hearing on the motion via zoom videoconferencing. At the hearing, Eileen R. Ridley and Monica S. Call represented Plaintiff Vendr, L. Reid Skibell represented Defendant Tropic, and Robert O. Rice represented Defendant Graham Sanders. The court took the motions under advisement. After carefully considering the parties' memoranda and arguments as well as the facts and law relevant to the pending motions, the court issues the following Memorandum Decision and Order on the pending motions.

## BACKGROUND

Plaintiff Vendr is suing its competitor Tropic Technologies and its former employee Graham Sanders in connection with Sanders's employment with Tropic and the alleged breach of the noncompete and nondisclosure provisions in his employment agreement with Vendr. Vendr and Tropic compete as providers of multiple software as service ("SaaS") products and services. These products and services include: 1) a negotiation-as-a-service that helps customers negotiate

contracts with third-party suppliers; 2) the management of software contracts for customers from contract inception to contract execution; 3) solutions to monitor customer's SaaS application usage; and 4) solutions to assist finance, procurement, and information technology departments in the procuring of such SaaS solutions.

Vendr was founded in 2018 and it alleges that it was the pioneer in the SaaS product and service provider field. Tropic was founded in 2019. Vendr considers the identity of its customers, technologies, processes, customer and supplier data, and growth and product strategy to be confidential and proprietary. Vendr limits distribution and access to these materials within Vendr. Vendr also takes measures to protect the secrecy of the information it considers confidential and proprietary, such as maintaining sophisticated IT security and infrastructure, using unique user IDs and strong passwords, and requiring all employees to sign confidentiality and noncompete agreements.

Sanders began working at Vendr on June 27, 2022, as a Senior Executive Buyer. As a Senior Executive Buyer, Sanders contacted software service suppliers to negotiate contract terms for the service for Vendr's customers. While Sanders worked at Vendr, there were forty buyers—five pods of buyers with eight in each pod. Each pod handled 60-100 customers. As a Senior Executive Buyer, Sanders did not have a dedicated group of customers with whom he worked, or an exclusive relationship with any particular customer. Sanders negotiated contract terms with software suppliers on behalf of customers but was not primarily responsible for managing Vendr's relationships with its customers. Vendr's Sales Team, Implementation Team, and Customer Satisfaction Team worked directly with customers.

When Sanders began his employment at Vendr, he entered into a written Employment Agreement that included a Confidential Information and Inventions Assignment Agreement

("PIIA"). Pursuant to his written Employment Agreement, Sanders agreed to abide by Vendr's rules and policies, including the provisions of the PIIA confidentiality agreement. The PIIA stated that Sanders's employment created a "relationship of confidence and trust" with respect to the confidential information Sanders would have access to and that Vendr had a "protectable interest" in the Confidential Information, which was laid out in detail. The PIIA also included a one-year noncompete provision precluding Sanders from employment with a competitor in the defined territory. Sanders also agreed to return all company property when his employment with Vendr terminated.

As Senior Executive Buyer, Vendr alleges that Sanders was privy to confidential and proprietary information, including data insights, customer lists and contacts, supplier lists and contacts, overall business processes and strategies, product plans, and plans for growth. Vendr alleges that Sanders participated in at least 100 individual customer deals across multiple third-party suppliers and industries. Sanders could not directly access customer information on Vendr's platform, but he could be provided such information by other Vendr teams. When Vendr assigned Sanders a customer contract, he would receive a copy of the service contract with a supplier so that he could negotiate a renewal contract. Once he had new terms for the customer's contract with a given supplier, Sanders would post them in Vendr's system. If a customer had issues with the terms, they would work with the Customer Satisfaction Team. .

After working for Vendr for approximately seven months, Sanders gave Vendr two weeks' notice of his intent to leave his employment. Sanders' employment with Vendr terminated January 18, 2023. During his exit interview over a video call with Mike Dockendorf, Vendr's Human Resources Business Partner, Vendr claims that Sanders did not disclose that he was going to work for a competitor, despite being asked, and that he was reminded of his continued contractual legal

obligations.

Vendr also alleges that Sanders downloaded a significant amount of confidential, proprietary, or trade secret information from Vendr's server to his company computer in the last weeks of his employment. Vendr's IT systems show that, in the last two weeks of Sanders' employment, there was a spike in Sanders' computer downloads. Vendr alleges that it appears that Sanders downloaded a list of all the deals he had worked on, as well as information about other deals with which he was not involved. The list of deals showed the buyer, supplier, stakeholders, type of deal, dates, and pricing. Vendr speculates that he copied that information to a personal computer or device. Sanders reset his laptop to factory settings before returning it to Vendr. Vendr asserts that this is contrary to the PIIA's requirement not to delete any information contained on his company computer.

On January 25, 2023, Sanders joined Tropic as a Senior Commercial Executive. Vendr claims that Tropic employs Sanders in a comparable position to the one that he held at Vendr, and his duties and responsibilities would substantially overlap with his duties and responsibilities at Vendr. Vendr, therefore, notified Sanders and Tropic that it believed his employment at Tropic breached the PIIA. Vendr claims that Sanders has its information, and such information could assist Sanders in his employment at Tropic because the companies compete for the same customers.

In response to Vendr's cease-and-desist letter, Tropic agreed for Sanders not to use any information he had from Vendr, if he had any, and to wall him off from any suppliers he worked with at Vendr. Tropic also told Vendr that they thought terminating Sanders was unwarranted because he was not in a management position, and he had already begun his employment. Tropic offered to discuss any additional prophylactic measures that Vendr believed might be necessary.

Tropic also told Vendr that if it believed that Sanders was in possession of any confidential or proprietary information, to notify Tropic immediately.

The parties went through another round of back-and-forth letters regarding Sanders' situation but could not agree on measures to alleviate Vendr's concerns. Vendr did not respond to Tropic's final letter on February 22, 2023. On March 7, 2023, both parties filed lawsuits against the other. Tropic filed a lawsuit against Vendr in New York state court to address Vendr's continuing accusations, *Tropic Technologies, Inc. v. Vendr, Inc.*, Index No. 651216/2023.

Vendr claims that Tropic has developed a concerted campaign to recruit Vendr's employees despite Tropic's knowledge that all Vendr's employees are subject to Employment Agreements that include confidentiality and noncompete obligations. Vendr claims that Sanders is just one such employee. Even after Vendr put Tropic on notice with cease-and-desist letters, it alleges that Tropic continued concerted efforts to contact and recruit Vendr employees.

## DISCUSSION

### Tropic's Motion to Dismiss

Tropic moves to dismiss each of Vendr's claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Tropic also seeks dismissal under the *Colorado River* abstention doctrine based on a parallel action pending in New York state.

On a motion to dismiss, the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019). "Conclusory allegations are not entitled to the assumption of truth. In fact, [courts] disregard conclusory statements and look to the remaining factual allegations to see whether Plaintiffs have stated a plausible claim." *Brooks v. Mentor Worldwide LLC,* 985 F.3d 1272, 1281 (10th Cir.), *cert. denied*, 142 S. Ct. 477 (2021).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is likely liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Complaint alleges seven claims for relief relating to Sanders' employment with Tropic and Sanders' alleged misappropriation of Vendr's confidential information. Vendr's claims against Tropic and Sanders are based on variations of the theory that Sanders and Tropic allegedly misappropriated Vendr's confidential information.

1.   Misappropriation Claims

Tropic argues that Vendr's claims grounded in misappropriation must be dismissed because Vendr fails to identify any confidential information or trade secrets that Tropic supposedly misappropriated. Tropic asserts that Vendr's allegations are vague and conclusory—for example, Vendr alleges Sanders provided to Tropic, and Sanders is using for Tropic's benefit, Vendr's confidential, proprietary, and trade secret information that Sanders obtained while employed at Vendr. Tropic argues that those types of conclusory allegations are inadequate as a matter of law because they do not identify the specific information Tropic allegedly received from Sanders.

In *LS3 Inc. v. Cherokee Nation Strategic Programs, LLC*, 2022 WL 3440692, at *5 (10th Cir. Aug. 17, 2022), the Tenth Circuit upheld the dismissal of misappropriation claims because "[t]he amended complaint lacked allegations identifying the information" the individual defendants provided their new employer "that may have been a protected trade secret."   In that case, the plaintiff acknowledged that it "'could not specifically say exactly what trade secrets were stolen.'" *Id.*   The court stated that the plaintiff fell short of the "line between possibility and plausibility" by failing to allege what trade secrets the defendants misappropriated. *Id.*

The Tenth Circuit's decision in *LS3 Inc.* does not impose a heightened pleading requirement, it merely applies the general notice pleading standards under *Iqbal*. 2022 WL 3440692, at *5. The Utah Supreme Court has also clarified that there is no particularity requirement under the UTSA. *Surgenex LLC v. Predictive Therapeutics, LLC*, 462 F. Supp. 3d 1160, 1171 (D. Utah 2020). "In the absence of a particularity requirement, the normal Rule 8 pleading standard applies. That is, [Vendr's] Complaint must simply contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *See id.*

Tropic argues that Vendr has failed to identify specific trade secrets that Sanders allegedly took and disclosed. Both the DTSA and the UTSA define a "trade secret" as information that (1) has independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) efforts that are reasonable under the circumstances to maintain secrecy. 18 U.S.C. § 1839(3); Utah Code Ann. § 13-24-2(4).

In the Complaint's general factual allegations, Vendr alleges that "[t]he identity of Vendr's clients, technologies, processes, customer and supplier insights, talk tracks, and data insights, and growth and product strategy is considered highly confidential and proprietary." Compl. ¶ 11.   As a Senior Executive Buyer, Vendr alleges that "Sanders was privy to Vendr confidential and proprietary information, including, without limitation, data insights, customer lists and contacts, supplier lists and contracts, overall business processes and strategies, product plans, and plans for growth." *Id.* ¶ 18. Vendr alleges in its Utah trade secrets claim that Sanders was privy to confidential, proprietary, and trade secret information, including "information regarding Vendr's business, operations, services, clients, growth, and marketing strategies, SaaS technologies and other proprietary information and/or commercially sensitive information." Compl. ¶¶ 53, 65. In its

federal trade secrets claim, Vendr alleges that the "misappropriated materials and information concerned Vendr's operations, services, clients, SaaS products, sales and marketing strategies, business information, plans, methods and processes." Compl. ¶ 67.

Vendr also alleged that it has taken steps to maintain the secrecy of its information, such as "maintaining sophisticated IT security and infrastructure; utilizing unique user IDs and strong passwords; and requiring all employees to sign confidentiality and non-compete agreements." *Id.* ¶ 12. Vendr further alleges that Tropic is a competitor in its SaaS market, Sanders went to work for Tropic in a comparable position in which his knowledge of confidential information would be used and disclosed to benefit Tropic. Compl. ¶¶ 10, 25, 26.

In *Surgenex, LLC v. Predictive Therapeutics, LLC*, 462 F. Supp. 3d 1160, 1171 (D. Utah 2020), the court found the plaintiff adequately alleged a trade secret by incorporating into the complaint a contract defining its work product and confidential information, which comprised plaintiff's "roadmap" for creating, marketing, and selling its products. *Id.* Vendr claims that it has similarly incorporated into its Complaint the definition of "Confidential Information" from the PIIA.

There are, however, factual differences between this case and *Surgenex*. *Surgenex* involved the research, formula, and processes involved in a discreet endeavor—making a unique allograft product—that was previously unknown to the other party. *Id.* In this case, Vendr and Tropic engage in the same type of business and did so before Sanders left Vendr. There is not the same kind of context involved. In *Surgenex*, the party suddenly knew how to make the other party's product. In this case, both parties have been engaging in the same kind of business for years and Vendr is not certain what if any information Tropic may have or may be using.

It is unclear whether Tropic does something differently now that Sanders works for it. The

court agrees with Tropic that Vendr cannot make every aspect of its business a trade secret. But the court must view the allegations in the Complaint in the light most favorable to Vendr. The court concludes that while it is very thin, Vendr claims enough information to survive a motion to dismiss. Vendr alleges that Sanders knew its specific clients and customer and supplier insights, Vendr derives independent economic value from keeping that information confidential, and Vendr uses reasonable means to maintain the information's secrecy. Given that the parties are known competitors, Vendr's allegations provide the reasonable inference that some of Vendr's insights as to specific customers and suppliers derive independent economic value from not being generally known or readily ascertainable to its competitors. Whether Sanders retained specific information that is actually a trade secret can be explored in discovery.

The Complaint accuses Sanders and Tropic of misappropriating Vendr's trade secrets, whether through acquisition, disclosure, or use. The Complaint alleges that Sanders gained access to Vendr's trade secrets, was bound by a contractual duty to maintain their secrecy, and after accepting comparable employment with Tropic, Sanders used and disclosed Vendr's trade secrets. The Complaint further specifies that Sanders obtained Vendr's confidential, proprietary, and trade secret information from Vendr's computer while employed for Vendr, and subsequently, Sanders knowingly and with intent to cause harm used and disclosed that information to Tropic. As for Tropic, the Complaint alleges that Tropic had actual notice of Sanders' use and disclosure of Vendr's trade secrets by virtue of Vendr's cease and desist letters. While Vendr has failed to allege any specific facts about what information Sanders disclosed to Tropic, when that disclosure occurred, or how it occurred, the parties can explore those details in discovery. The court concludes that the allegations are sufficient for the court to infer that Tropic may have had reason to know of Sanders' alleged use and disclosure of Vendr's trade secrets, given that all reasonable

inferences must be drawn in Vendr's favor. Finally, the Complaint alleges that Tropic engaged in a predatory campaign to acquire, use, and disclose Vendr's confidential information, and that Tropic is currently making use of Vendr's trade secrets. Again, there are no allegations as to what specific information Tropic has access to and is or is not using, but the parties can explore that in discovery.

On a Rule 12(b)(6) motion—where all reasonable inferences must be drawn in Vendr's favor—the court concludes that Vendr has sufficiently identified some matters, such as customer and supplier insights, that could constitute trade secrets, the potential of misappropriation of those trade secrets, and circumstances that could give rise to an inference that Tropic could have had reason to know of Sanders' alleged misconduct. While Vendr's allegations are as close to bare bones as allegations could be, the court deems them sufficient to survive a motion to dismiss. Accordingly, the court denies Tropic's motion to dismiss the misappropriation claims.

2. Hiring Practices Claims

Vendr's second and third claims for relief, alleging unfair competition and tortious interference, seek to impose liability on Tropic for its hiring practices which Vendr characterizes as an improper "predatory" campaign.   Unfair competition requires a plaintiff to plead an "intentional business act or practice that is unlawful, unfair, or fraudulent" and which "leads to a material diminution in value of intellectual property." Utah Code Ann § 13-5a-102(4). Unfair competition governs predatory hiring practices, but it expressly "does not include the departure and hiring of an employee by a competitor." *Id.* Thus, as a matter of law, the departure and hiring of just Saunders cannot constitute unfair competition. Vendr, however, has also alleged predatory hiring practices in the form of an intentional scheme by Tropic to recruit multiple Vendr employees, Sanders being only one of many, and to induce those employees to violate their contractual obligations. Therefore, this larger scheme would be sufficient to survive a motion to

dismiss.

To state a claim for tortious interference under Utah law, a plaintiff must allege: "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff." *CounselNow, LLC v. Deluxe Small Bus. Sales Inc.*, 430 F.Supp.3d 1247, 1261 (D. Utah 2019). Tropic's motion to dismiss focuses on the lack of any improper means. Vendr must allege some type of "improper means" used to achieve the alleged interference. *C.R. England v. Swift Transportation Co.*, 437 P.3d 343 (Utah 2019). Utah law interprets "improper means" narrowly and it does not include the simple recruitment and hiring of employees. *Id.* at 354 ("We have been careful to limit the scope of actionable conduct within the tortious interference context to those situations where a defendant employs a means that is independently tortious or wrongful."). Improper means is "satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules. Such acts are illegal or tortious in themselves and hence are clearly improper." *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 308 (Utah 1982) *overruled in part by Eldredge v. Johndrow*, 2015 UT 21, 345 P.3d 553). A defendant's means may also be improper if they involve "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood" or where they violate "an established standard of a trade or profession." *Id.*

As to improper means, Vendr's Complaint alleges that "Tropic's predatory practices of hiring Sanders to obtain access to Vendr's confidential, proprietary, and trade secret information constitutes improper means. Likewise, Tropic's receipt and/or use of that information also constitutes improper means." Compl. ¶ 50.

In response to Tropic's motion to dismiss, Vendr alleges that Tropic employed an improper

means by violating an established standard of a trade or profession. This court previously held that allegations of similar facts are sufficient to state a claim that the defendant employed an improper means by violating an established industry standard. *Ivanti, Inc. v. StayLinked Corp.*, No. 2:19-cv-75-DB, 2019 WL 4645325, at *3 (D. Utah Sept. 24, 2019).

Although Vendr cites to *Ivanti* in support of its industry standard theory, the Ivanti plaintiff actually alleged "that confidentiality and non-competition are established industry-wide standards and that [the defendant] was aware of these industry standards when it violated them through its interactions with [the employees]." Id. at *3. Here, Vendr's Complaint does not specifically state anything about the violation of an industry standard. Vendr's Complaint does, however, allege that Tropic knew of Vendr's non-compete agreements, that Tropic also used non-compete agreements with its employees, and Tropic knowingly recruited Vendr's employees to get insider knowledge and to give Tropic a competitive advantage. Vendr's allegation that Tropic also uses nondisclosure and noncompete agreements provides an inference that other companies in the industry are aware that companies in the industry take steps to protect their information from competitors. Therefore, while Vendr does not specifically allege that Tropic knowingly violated standards of non-competition and confidentiality that are widely accepted and used by companies in the SaaS industry, several of its allegations refer to Tropic's alleged actions being contrary to Vendr's alleged actions and provide an inference that Tropic's alleged behavior was outside the industry norm.

The court does not believe that Vendr's use of non-compete agreements for all its employees changes whether it has sufficiently pled a claim for tortious interference. The parties can explore in discovery the details of the industry standards. Given that Sanders has not moved to dismiss the breach of contract claim based on the non-compete agreements invalidity, the court

will not address the issue.

Vendr's motion also argues that to establish an improper purpose, Vendr must allege that Tropic hired Sanders purely to spite and hinder Vendr. Tropic, however, provides no citation to support this characterization of the phrase predatory hiring practice. Tropic's assertion also ignores the plain language of the Complaint, which alleges that Tropic engaged in predatory hiring practices by hiring Sanders with the primary purpose of harming Vendr.

Vendr further counters that its tortious interference claim is not preempted by the UTSA to the extent that the claim relies on trade secret misappropriation because it alleges several forms of improper means in addition to trade secret misappropriation. In *CDC Restoration & Const. LC v. Tradesmen Contractors, LLC*, the Utah Court of Appeals held that "a claim is preempted to the extent that it is based on factual allegations supporting a misappropriation of trade secrets or otherwise confidential information," but "to whatever extent that the claim is 'based upon wrongful conduct independent of the misappropriation of trade secrets' or otherwise confidential information, it is not preempted." 274 P.3d 317, 331 (Utah Ct. App. 2012).

Tropic relies on *Premier Sleep Sols., LLC v. Sound Sleep Med., LLC*, No. 2:20-cv-JNP-JCB, 2021 WL 1192579, at *5 (D. Utah Mar. 30, 2021). But in that case, the court emphasized that "*CDC Restoration* does not stand for the proposition that an entire claim is precluded simply because one of the underlying factual allegations is based upon misappropriation of trade secrets or other confidential information." *Id.* at *5. "Rather, *CDC Restoration* permits a claim to endure to the extent that the claim relates to conduct independent of the misuse of confidential information. The standard is whether the claim fails without allegations regarding misuse of information, in which case the UTSA preempts the claim." *Id.* In *Premier Sleep*, plaintiff's breach of fiduciary duty claim was not preempted by the UTSA because in addition to

the misappropriation of trade secrets, plaintiff's claim alleged that defendants breached the duty of loyalty by diverting customers and resources, withholding business opportunities, and otherwise competing with plaintiff while still employed by plaintiff. *Id.*

Likewise, Vendr's tortious interference claim is not preempted by the UTSA because, in addition to the misappropriation of trade secrets, the Complaint alleges that Tropic engaged in predatory hiring practices by hiring Sanders with the purpose of harming Vendr and in violation of established standards within the SaaS industry.

Viewing the facts in the light most favorable to Vendr and giving every reasonable inference to Vendr, the court concludes that Vendr has sufficiently pled claims for unfair competition and tortious interference.

3.   Breach of Contract Claims

Tropic asks the court to declare the non-compete agreement between Vendr and Sanders as unenforceable. Vendr's claim for breach of the non-compete agreement is only asserted against Sanders. Sanders has not moved to dismiss the breach of contract claims. Tropic argues that the court should address whether the non-compete agreement is valid because it may relate to the claims Vendr asserts against it. In its prior order on Vendr's Motion for Temporary Restraining Order, the court has already expressed its concerns with respect to the non-compete agreement's enforceability. However, the court does not believe that Tropic presently has a basis for obtaining a ruling on the breach of contract claim asserted only against Sanders. To the extent that the validity of the non-compete agreement relates to the claims asserted against Tropic, the court will more properly address the issue on summary judgment.

4.   Computer Access Claims

The sixth and seventh claims for relief are essentially overlapping federal and state

statutory claims Vendr asserts against Sanders pursuant to the federal Computer Fraud and Abuse Act and Utah's Computer Abuse and Data Recovery Act. Vendr asserts these claims against only Sanders, and Sanders has not moved to dismiss the claims. Tropic does not have standing to seek dismissal of the claims not asserted against them. Therefore, the court will not address these claims as part of Tropic's motion to dismiss.

5.   Venue

If this court does not dismiss the claims for failure to state a claim, Tropic argues that this court should stay or dismiss this action under the *Colorado River* doctrine which applies to parallel state and federal proceedings. The New York action sought a declaration pursuant to New York law that (1) Tropic did not tortiously interfere with Sanders' employment agreement with Vendr; (2) the restrictive covenants in Sanders' employment agreement with Vendr are void pursuant to the MNAA and other applicable legal authorities; and (3) Tropic's exploratory conversations with individuals employed by Vendr do not constitute tortious interference with their employment agreements. However, Tropic mooted its own argument that this case should be stayed by voluntarily discontinuing the New York state court action. *Colorado River* abstention is unavailable given that there is no longer a pending state proceeding.

Based on the above reasoning, the court denies Vendr's motion to dismiss.

## Sanders' Motion to Stay and Compel Arbitration

Sanders argues that Vendr brought this action against him in violation of its contractual promise to arbitrate "any and all" claims against him, expressly including those arising out of the noncompetition agreement at the center of this dispute. There is a liberal federal policy favoring arbitration. Under Section 2 of the Federal Arbitration Act ("FAA"), arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

revocation of any contract." 9 U.S.C. § 2. Thus, when interpreting an arbitration clause in a contract, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). "An arbitration agreement is enforceable if there exists a valid agreement to arbitrate, and if the dispute falls within the scope of that agreement." *Dumas v. Warner Literary Grp., LLC*, No. 16-CV-518-RM-NYW, 2016 WL 9344244, at *3 (D. Colo. Aug. 8, 2016) (citing *Nat'l Am. Ins. v. SCOR Reins. Co.*, 362 F.3d 1288, 1290 (10th Cir. 2004)).

In this case, the Complaint states that Vendr and Sanders entered into a written Employment Agreement along with an associated proprietary information and invention assignment agreement referred to as the "PIIA." Compl. ¶17.

The Employment Agreement provides:

> Governing Law:   The terms of this letter and the resolution of any dispute as to the meaning, effect, performance or validity of this letter or arising out of, related to, or in any way connected with, this letter, your employment with the Company or any other relationship between you and the Company (a "Dispute") will be governed by the law of the State of MA, without giving effect to the principles of conflict of laws. You and the Company consent to the exclusive jurisdiction of, and venue in, the state and federal courts in MA. To ensure the timely and economical resolution of disputes that may arise in connection with your employment with the Company, you and the Company agree that any and all disputes, claims, or causes of action arising from or relating to the enforcement, breach performance, negotiation, execution, or interpretation of this letter agreement, the PIIA, or your employment, or the termination of your employment, including but not limited to all statutory claims, will be resolved pursuant to the Federal Arbitration Act, 9 U.S.C. S 1-16, and to the fullest extent permitted by law, by final, binding, and confidential arbitration by a single arbitrator conducted in Boston, Massachusetts by Judicial Arbitration and Mediation Services, Inc. ("JAMS") under the then applicable JAMS rules . . . . By agreeing to this arbitration procedure, both you and the Company waive the right to resolve any such dispute through a trial by jury or judge or administrative proceeding.

The PIIA provides:

> This Agreement, together with the Exhibits herein and any executed written offer letter between [Sanders] and Company, is the final complete and exclusive

16

agreement between [Sanders] and Company with respect to the subject matter of this Agreement and supersedes and merges all prior discussions between [Sanders and Vendr], whether written or oral; provided, however, if, before execution of this Agreement, Company and [Sanders] were parties to any agreement regarding the subject matter hereof, that agreement will be superseded by this Agreement prospectively only, except at any restrictive covenant provision of such agreement will not be superseded and will remain in effect and enforceable without limited or affecting the provisions of this Agreement.

The PIIA also provides:

Governing Law: Consent to Personal Jurisdiction; Notice of Change to Work Location.   This Agreement will be governed by and construed according to the laws of the state or district in which I primarily work for Company without regard to any conflict of laws principles that would require the application of the laws of a different jurisdiction. I expressly consent to the personal jurisdiction and venue of the state and federal courts located in the state or district in which I primarily work for Company and the state or district in which Company's headquarters is located for any lawsuit filed there against me by Company arising from or related to this Agreement (although I understand Company will not file a lawsuit in the state or district in which Company's headquarters is located if prohibited by applicable law). I will not change the state or district where I am primarily working for the Company without providing prior written notice to the Company of such change (other than in the case of any such requested or required of me by the Company).

Therefore, Vendr crafted a broad arbitration provision, under which it promised to arbitrate "any and all disputes, claims or causes of action arising from or relating to the enforcement, breach performance, negotiation, execution, or interpretation of this letter agreement, the PIIA, or your employment, or the termination of your employment, including but not limited to all statutory claims, will be resolved pursuant to the Federal Arbitration Act" Vendr also agreed that "[q]uestions of whether a claim is subject to arbitration under this agreement) [sic] shall be decided by the arbitrator."

While the Employment Agreement broadly requires arbitration of any disputes relating to Sanders' employment using Massachusetts law, the PIIA states that it will be governed by the laws of the state in which Sanders primarily works for Vendr and that Sanders agrees to personal

jurisdiction and venue in the state and federal courts in the state or district in which he primarily works for Vendr. The parties dispute how these two documents and the provisions in each apply to each other and apply to the arbitration dispute before the court.

Vendr has already stated to the court that it is suing Sanders under the Employment Agreement and the associated PIIA. Vendr now claims, however, that the two agreements are separate. The language of the two agreements, however, do not support that assertion. Both documents integrate the other, as Vendr appeared to agree with at the outset of this lawsuit. The PIIA expressly incorporates the arbitration provision, and the Employment Agreement requires that Sanders sign the PIIA. The PIIA likewise references the employment agreement when it states that the PIIA, together with "any executed written offer letter between me and the Company, is the final, complete and exclusive agreement between me and the Company with respect to the subject matter of this [PIIA]."   The PIIA and the employment agreement are a single integrated contract. *Montes v. Nat'l Buick GMC Inc.*, 2023 UT App 47, P11.   As such, the court must observe that even actions under the PIIA are subject to the arbitration provision. It does not matter whether Vendr proceeds under the PIIA or the Employment Agreement because the two documents constitute a single, integrated contract governed by the arbitration provision. The arbitration provision also specifically incorporates and includes any and all claims under the PIIA. Even if Vendr was only suing Sanders under the PIIA, as it now claims, the arbitration provision in the Employment Agreement incorporates by reference the PIIA. And the PIIA incorporates by reference the arbitration requirement in the Employment Agreement.

Vendr claims that the arbitration provision in the Employment Agreement expired when Sanders left his employment with Vendr, but the PIIA remains in effect. The arbitration provision is silent as to its duration, but it is exceptionally broad with respect to the matters subject to

arbitration. It states that Sander and Vendr "agree that any and all disputes, claims, or causes of action arising from or relating to the enforcement, breach, performance, negotiation, execution, or interpretation of this letter agreement, the PIIA, or your employment, or the termination of your employment, including but not limited to all statutory claims will be resolved" in arbitration. To ensure the complete forfeiture of litigation rights, it also includes language where the parties waive their "right to resolve any such dispute through a trial by jury or judge or administrative proceeding."

The plain language of the Employment Agreement shows it remains extant. The employment agreement allows either party the right to terminate employment at will. The agreement also has a provision stating that when one term in the agreement is no longer enforceable, "the remainder of the terms herein will remain in full force and effect." When Sanders exercised his at will right to terminate his employment, the remaining terms of the employment agreement remained in effect. The arbitration provision itself states that any dispute or cause of action arising from or relating to Sanders' termination of employment has to be arbitrated. The only way that type of dispute can be arbitrated is after the termination of his employment.

"An arbitration clause in a contract is presumed to survive the expiration of that contract." *Newmont U.S.A., Ltd. v. Ins. Co. of N. Am.*, 615 F.3d 1268, 1275 (10th Cir. 2010). "This presumption might be overridden given some express or clearly implied evidence that the parties included to override that presumption, or the relevant dispute cannot be said to have arisen under the previous contract." *Id.* But Vendr's opposition does not address any such circumstances. There is no express or implied evidence that Sanders or Vendr intended the arbitration provision to expire after Sanders' employment ended. To the contrary, the arbitration provision in the employment agreement specifically provides that Vendr agreed to arbitrate any and all claims

arising from "the termination of [Sanders'] employment." Vendr also promised to arbitrate any and all claims related to the PIIA, which Vendr alleges Sanders violated in his post-termination employment with Tropic. This language confirms that Vendr intended to arbitrate with Sanders after his employment at Vendr ended.

Vendr's Complaint repeatedly refers to Sanders' breach of the employment agreement and the PIIA. Vendr also filed the employment agreement under seal so the court could consult it. Its motion for temporary restraining order also alleged that the employment agreement and the PIIA constitute valid, binding, and enforceable written contracts. Vendr's current contention that it is only suing Sanders under the PIIA is not supported by the language of the documents or Vendr's actions in this lawsuit. It is also clear that Vendr is suing Sanders with respect to actions he allegedly took before and after his employment with Vendr terminated. There is no basis for the court to conclude that Vendr is only suing Sanders under the PIIA. Vendr has not overcome the presumption that the arbitration provision survived Sanders' employment termination. *Newmont*, 615 F.3d at 1275.

Moreover, because Vendr's arbitration provision is broad in nature, the court must presume that the parties "agreed to arbitrate disputes concerning the duration" of the Arbitration Agreement as well. *Nat'l R.R. Passenger Corp. v. Bos. & Maine Corp.*, 850 F.2d 756, 764 (D.C. Cir. 1988). Because Vendr's promise to arbitrate was phrased "to encompass all claims," that promise necessarily included Vendr's claim that the arbitration provision expired.

Vendr also asserts that a "harmonious reading" of the relevant contracts allegedly reveals that the parties intended to litigate claims under the PIIA and arbitrate claims under the Employment agreement. However, a harmonious reading of the agreements does not support this assertion. As discussed above, Vendr's claim that it is only suing under the PIIA is without merit.

Vendr repeatedly stated it was suing Sanders under the Employment Agreement and the PIIA for pre- and post-termination conduct. Vendr's argument that it proceeds only under the PIIA, which it claims is not within the arbitration provision of the Employment Agreement, is simply an argument about the scope of the Arbitration Provision. But Vendr already agreed that "[q]uestions of whether a claim is subject to arbitration under this agreement) [sic] shall be decided by the arbitrator." Vendr does not challenge this aspect of the arbitration provision. Thus, any contention that its action under the PIIA is not within the scope of the arbitration provision is for the arbitrator to decide. Likewise, any contention that Sanders' post-termination conduct is not within the scope of the arbitration provision is for the arbitrator to decide.

Vendr further argues that the Employment Agreement's arbitration provision and the PIIA's forum selection clause "irreconcilably conflict" such that there was no contract formation with respect to arbitration. Therefore, Vendr claims that the arbitration provision is void because it is in conflict with the provisions in the PIIA. The court again notes that this assertion contradicts Vendr's initial allegations to the court that the Employment Agreement and the PIIA are valid and enforceable contracts. Moreover, Vendr is the party who drafted both documents and made Sanders sign the agreements as part of his employment.

In any event, the two agreements do not irreconcilably conflict. The PIIA's venue selection clause merely states that Sanders "consents" to venue "in the state or district in which I primarily work for Company and the state or district in which Company's headquarters is located for any lawsuit filed there against me by Company arising from or related to this Agreement." The PIIA's venue selection clause is permissive, not mandatory. "The difference between a mandatory and permissive forum selection clause is that '[m]andatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum.'" *Am. Soda LLP v.*

*U.S. Filter Wastewater Grp., Inc*, 428 F.3d 921, 926 (10th Cir. 2005) (citation omitted). "In contrast, permissive forum selection clauses authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere." *Id.* at 926-27. In the PIIA's venue selection clause, Sanders merely consents to jurisdiction in a particular venue. A party's consent to a venue is a permissive clause. In contrast, the arbitration provision in the Employment Agreement is mandatory. It states that any and all disputes will be resolved in arbitration. It also has the parties affirmatively waive their right to a trial by jury, judge, or administrative proceeding. The provision further provides that questions of arbitrability must be submitted to arbitration. Because the arbitration provision uses mandatory language, it is mandatory, not permissive like the venue clause. Therefore, there is no conflict because one clause is permissive and one clause is mandatory.

The more general terms of the PIIA are restricted by the specific arbitration requirement in the Arbitration Provision. The alleged conflict does not provide a basis for finding that there was no contract formation. There is a valid and enforceable contract to arbitrate.

There is some question about whether the Employment Agreement permits limited use of the courts for seeking injunctive relief. On the one hand, the arbitration provision describes the arbitration procedure in detail, explaining that the parties waive the right to have any dispute resolved by a "judge" and that an arbitrator is entitled to "award any and all remedies that [Sanders] or the Company would be entitled to seek in a court of law." On the other hand, the arbitration provision states that court action may be permitted to prevent irreparable harm, but only "pending the conclusion of such arbitration." Vendr first chose to litigate, not arbitrate, but it cannot argue it is litigating now "pending the conclusion of any such arbitration." While an arbitrator must resolve any conflicts related to interpretation of the arbitration provision, it is clear that an action for injunctive relief may only proceed "pending the conclusion of" arbitration.

Because the court finds that there is a valid and enforceable arbitration provision that applies to the present dispute between Vendr and Sanders, the court grants Sanders' motion to stay and compel arbitration.

## CONCLUSION

Based on the above reasoning, Defendant Tropic Technologies, Inc.' Motion to Dismiss [ECF No. 60] is DENIED, and Defendant Graham Sanders' Motion to Stay and Compel Arbitration [ECF No. 62] is GRANTED.

DATED this 19th day of December 2023.

BY THE COURT:

DALE A. KIMBALL,
UNITED STATES DISTRICT JUDGE